574 So.2d 1095 (1991)
Bobby Lee DOWNS, Appellant,
v.
STATE of Florida, Appellee.
No. 73877.
Supreme Court of Florida.
January 18, 1991.
*1096 Nancy Daniels, Public Defender and W.C. McLain, Asst. Public Defender, Second Judicial Circuit, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen. and Mark C. Menser, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
Bobby Lee Downs appeals his sentence of death and related criminal conviction. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm the conviction but reverse the trial judge's override of the jury recommendation of a life sentence.
Downs was convicted of murder for the April 20, 1988, shooting death of his estranged wife, Nicole Downs, and of aggravated assault on Terry Strickland, a witness to the murder. Downs and his wife had been separated several months at the time of the murder. Trial testimony established that he had threatened several times to kill his wife. On the morning of the murder, Downs stole a gun and bullets from the home of an acquaintance. He telephoned Nicole at least three times that morning. During one of the conversations Nicole told Downs that he could come to see the children.
Downs arrived at the house at approximately 11:30 or 11:45 a.m. Nicole, Terry Strickland, and five children, including the Downses' two young children, were present. According to Strickland's testimony, Downs asked Nicole to come back to *1097 him and give him a second chance. He asked her to kiss him and to go to the kitchen and outside to talk to him. She refused. Nicole noticed a gun in Downs' pants and attempted to call the police. Downs pulled the gun and shot the telephone while she was holding it to her ear. Nicole grabbed two of the children and held them. Downs held the gun on her and repeatedly asked her to release the children. Downs returned the gun to his pocket, but later he pulled the gun on her again. After asking Nicole several more times to release the children, he grabbed her by the hair and shot her three times. Their two children were in her arms. One of the shots was instantly fatal.
The jury found Downs guilty of first-degree murder and aggravated assault and recommended that Downs be sentenced to life imprisonment without possibility of parole for twenty-five years for the murder conviction. The trial judge overrode the jury recommendation and sentenced Downs to death. The trial judge found four aggravating factors and no mitigating factors.[1]
Downs raises two issues related to the murder conviction. First, he claims the trial court improperly excluded certain hearsay statements relevant to his state of mind at the time of the murder. Between 10:00 p.m. April 19, the day before the murder, and 3:00 a.m. April 20, Downs talked to several people whose testimony he proffered at trial. Downs telephoned his aunt around 10:00 p.m. April 19. She could tell that he had been drinking. He told her he loved Nicole, that Nicole was going off with another man, and that he would not get to see his children. He asked his aunt to go with him to see the children. She advised him to sleep it off and said she would go with him the next day. Downs visited his wife's sister sometime that same evening and asked her for leads or information about Nicole. According to her proffered testimony, Downs had previously told her he suspected that Nicole was having an affair with a family friend.
Downs saw a friend, Susan Pulsifer, around 11:00 p.m. at the convenience store where she worked. He purchased a six-pack of beer and talked to her about his relationship with Nicole, saying that he loved Nicole but felt the relationship was over. Downs called his brother between 11:00 p.m. and midnight that same evening. His brother stated that Downs was drunk. Downs asked his brother to take him to Nicole's house to get the children, but his brother advised him to wait until the next day. Downs went to the house of another friend around 12:30 or 1:00 a.m. April 20, and asked the friend to go somewhere with him but did not say where.
Downs also talked with two different police officers between 2:00 and 3:00 a.m. April 20. He told them he was having problems with his wife and asked them to go with him to her house. They each advised him to wait until the next day.
The trial court excluded all testimony regarding the content of these conversations as hearsay. The court also excluded a recorded conversation between Downs and a police dispatcher in which Downs expressed concern over his marital problems and his children. The court allowed the witnesses to testify that Downs telephoned or spoke to them and to testify about his sobriety at the time they saw or talked to him.
Downs contends that the testimony with respect to what he said was admissible under the state-of-mind exception to the hearsay rule. § 90.803(3)(a), Fla. Stat. (1987). He argues that the excluded testimony shows he was in a state of mental and emotional confusion and rebuts the state's theory that he went to Nicole's house on April 20 with intent to kill her. Downs also claims the testimony explains his motive for going to her house, in that several people advised him not to visit her *1098 in the middle of the night but rather to wait until the next day.
We believe the testimony should have been admitted. Because Downs was charged with premeditated murder, his state of mind at the time of the murder was in issue.[2]See United States v. Ponticelli, 622 F.2d 985, 991 (9th Cir.) (under Federal Rule of Evidence 803(3), where state of mind is at issue, court must determine if declarant's state of mind at the time of declaration is relevant to his state of mind at the time in issue), cert. denied, 449 U.S. 1016, 101 S.Ct. 578, 66 L.Ed.2d 476 (1980).
Notwithstanding, we conclude that the exclusion of the testimony constituted harmless error. In light of the evidence describing how the murder was committed, Downs' earlier statements would have had minimal probative value on the issue of premeditation. Further, Downs' confused mental state and his despair concerning his marriage were clearly established by other evidence. For example, his wife's mother testified that one or two nights before the shooting, Downs told her he loved his wife and children and was afraid Nicole might take the children away from him. There was also evidence suggesting that Downs believed his wife was romantically involved with another man. We are convinced that the admission of the proffered testimony would not have affected the finding of guilt.
In the second issue raised on appeal, Downs argues that the trial court improperly admitted two hearsay statements of the victim under the state-of-mind exception to the hearsay rule. During cross-examination of Judith LeClerc, the victim's mother, defense counsel attempted to elicit testimony that Nicole willingly continued to spend time with Downs despite their separation. On redirect, the state elicited the following testimony from Mrs. LeClerc:
Q: Did you talk with your daughter about her feelings about Bobby Downs?
A: Yes, ma'am, I did.
Q: And in April and when she left him in January of 1988 what were her feelings about Bobby Downs?
A: She loved him, but she was afraid of him.
Q: Did she tell you why she was afraid of him?
A: Because he had threatened her life.
The trial judge permitted this line of questioning, finding that defense counsel had opened the door to the victim's state of mind.
Second, Terry Strickland testified that he overheard Nicole say to Downs in a telephone conversation the morning of the murder, "Bobby, I'm not going back with you, you stuck a gun to me and my kids once, you are not going to do it again." The trial court denied Downs' motion for a mistrial, determining that this was admissible as evidence of the victim's state of mind.
We find that the trial court erred in admitting these two statements. The statements are hearsay because they were admitted to prove the truth of the statements. The victim's state of mind was not in issue in the trial. Nor were the statements offered to prove or explain any subsequent acts of relevance. Further, the victim's statements cannot be used to prove Downs' state of mind. See Correll v. State, 523 So.2d 562, 565 (Fla.), cert. denied, 488 U.S. 871, 109 S.Ct. 183, 102 L.Ed.2d 152 (1988); Hunt v. State, 429 So.2d 811, 813 (Fla. 2d DCA 1983); Bailey v. State, 419 So.2d 721, 722 (Fla. 1st DCA 1982); Kennedy v. State, 385 So.2d 1020, 1022 (Fla. 5th DCA 1980). Accordingly, the state-of-mind exception to the hearsay rule is inapplicable. Nevertheless, in view of the other evidence against Downs, we also find the admission of this testimony to *1099 be harmless error. Correll, 523 So.2d at 565-66; Palmes v. State, 397 So.2d 648 (Fla.), cert. denied, 454 U.S. 882, 102 S.Ct. 369, 70 L.Ed.2d 195 (1981).
Downs raises three issues related to his death sentence. We address only his claim that the trial court erred in overriding the jury's recommendation of life imprisonment and imposing the death penalty.[3]
A jury's recommendation of life imprisonment is entitled to great weight. See Tedder v. State, 322 So.2d 908, 910 (Fla. 1975). Under Tedder, a trial court errs in overriding a jury's recommendation if facts are evident from the record upon which a reasonable juror could rely in recommending life imprisonment. Cheshire v. State, 568 So.2d 908, 911 (Fla. 1990); Freeman v. State, 547 So.2d 125, 129 (Fla. 1989); Hall v. State, 541 So.2d 1125 (Fla. 1989); Harmon v. State, 527 So.2d 182 (Fla. 1988); Ferry v. State, 507 So.2d 1373 (Fla. 1987).
We find ample mitigating evidence on which the jury reasonably could have relied in recommending life imprisonment. The jury reasonably could have concluded that the murder was committed while Downs was under the influence of extreme mental or emotional disturbance. Testimony indicated that Downs was distraught over his failing marriage and his belief that he was losing his wife and children to another man. Downs and his wife argued over the telephone about the other man shortly before the shooting. Evidence also indicated that Downs had been drinking the night before and day of the murder and that he had a history of drug and alcohol abuse. The testimony of a psychologist for the defense indicated that Downs had an IQ of 71, a mental age of 13, was borderline mentally retarded, and suffered from schizoid personality disorder. The psychologist testified that as a result of the combination of his mental impairment and emotional state, Downs suffered from an extreme emotional disturbance and had impaired capacity to appreciate the criminal nature of his actions at the time of the murder. We cannot say the jury's recommendation under these circumstances was unreasonable. Further, the recommendation is consistent with other cases involving domestic confrontations or lovers' quarrels in which this Court has found the death penalty unwarranted. See, e.g., Cheshire v. State, 568 So.2d at 911-12; Fead v. State, 512 So.2d 176 (Fla. 1987), receded from on other grounds, Pentecost v. State, 545 So.2d 861 (Fla. 1989); Irizarry v. State, 496 So.2d 822 (Fla. 1986); Chambers v. State, 339 So.2d 204 (Fla. 1976).
We affirm Downs' convictions of first-degree murder and aggravated assault. However, we vacate the sentence of death and remand for imposition of a life sentence without possibility of parole for twenty-five years. We also affirm the five-year sentence for aggravated assault. In accordance with the judge's prior order, the two sentences shall be consecutive to each other.
It is so ordered.
SHAW, C.J., and OVERTON, McDONALD, BARKETT, GRIMES and KOGAN, JJ., and EHRLICH, Senior Justice, concur.
NOTES
[1] The trial court found that the murder was especially wicked, evil, atrocious, or cruel; the murder was cold, calculated, and premeditated; the murder was committed while the defendant was engaged in a burglary; and the defendant had been convicted previously of a violent felony.
[2] We recognize that at least some of the proffered testimony was not hearsay at all because it was not offered to prove the truth of the matter asserted. § 90.801(1)(c), Fla. Stat. (1987). However, for purposes of our analysis in this case, it makes no difference. 4 J. Weinstein & M. Berger, Weinstein's Evidence § 803(3)[02] (1990). The real issue is whether the statements were sufficiently relevant in view of the fact that they were made a number of hours before the murder.
[3] Downs also claims that the death sentence is disproportional to the offense and the offender and that the trial court erred in finding as aggravating circumstances that the crime was especially heinous, atrocious, or cruel and that it was cold calculated, and premeditated.